IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BETTY L. GUNTER, *et al*, )<br>    Plaintiffs, )<br>)<br>v. )<br>)<br>CHASE BANK USA, N.A., )<br>    Defendant. ) | CIVIL ACTION 07-00403-KD-M |

### ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment (Docs. 138-141), the Plaintiffs' Response (Docs. 143-144, 146), and the Defendant's Reply (Doc. 150).

**I.**    **Background**

**A.**    **Procedural**

On June 1, 2007, Plaintiffs Betty L. Gunter, Donald C. Redd, Sr., and Bernadette E. Redd, on behalf of themselves and all others similarly situated ("Plaintiffs") initiated this class action complaint in which they allege that after closing on the mortgage loans on their principal residences with Defendant Chase Bank USA, N.A. ("Chase"), their payments of "discount points" violated Section 8(b) of the R*eal Estate Settlement Procedures Act* ("RESPA"), 12 U.S.C. § 2607(b). (Doc. 1). Specifically, Plaintiffs allege that Chase disguised unearned fees by calling them "Loan Discount" fees on the HUD-1s, that no service was performed or provided to Plaintiffs in return for the payment of the Loan Discount fees, and that Plaintiffs did not receive a lower interest rate in return for paying such fees. Plaintiffs assert claims against Chase for

RESPA violations and for breach of contract.[1]

In August 2007, Chase moved to dismiss the complaint alleging that: 1) the plain language of the RESPA statute requires two service providers who share or split a fee, not a unilaterally imposed fee; 2) the closing statement and the Note constitute one entire contract, and 3) a collection of six points is not a violation of state law because federal law regulating banks preempts state usury law and allows for the payment of any amount of points. (Docs. 4, 5). On October 26, 2007, the Court denied that portion of Chase's motion to dismiss related to the alleged RESPA violations and breach of contract claim. (Doc. 24).

On June 19, 2008, Plaintiffs filed a motion to amend the complaint to add a claim of suppression (Doc. 81), which the Court granted on August 6, 2008 despite Chase's objection.[2] (Doc. 92, 106). The Amended Complaint alleges that Plaintiffs were charged a "loan discount" fee which was falsely depicted on the HUD-1, in that it was not for a "loan discount;" that Chase had a duty to disclose the terms of the loan and the charges imposed, and falsely labeled the charges, imposing fees Plaintiffs had not knowingly consented to and which were unearned or misrepresented; and that Chase suppressed that a charge was required and imbedded within the loan discount charge to reduce Plaintiffs' prepayment penalty. (Doc. 107). Plaintiffs allege further that no service was performed or provided to them by Chase in return for payment of "Loan Discount Fees" and they did not receive a lower interest rate in return for such payment.

---

[1] Plaintiff Gunter also alleged an individual claim for usury under Alabama law; however, that claim has been dismissed. (Doc. 24).

[2] The factual allegations in the Amended Complaint are substantially similar to those alleged initially. The Amended Complaint,. however, includes a new count of suppression (Count III) against Chase alleging that Chase suppressed information regarding the terms of the loan. It also appears that Plaintiffs added a breach of implied contract claim to the original breach of contract count.

On June 20, 2008, before the Court granted Plaintiffs' motion to amend the complaint, Chase filed its initial motion for summary judgment. (Docs. 83-86). On December 12, 2008, Chase moved to withdraw its motion for summary judgment in light of the pending appeal of Judge Granade's dismissal decision in Wooten v. Quicken Loans, Inc. 2008 WL 687379, *4-6 (S.D. Ala. Mar. 10, 2008), *on appeal* (Case No. 08-11245-HH),[3] "which will be potentially dispositive of certain of Plaintiff's claims." (Doc. 132). The Court granted Chase's motion to withdraw and stayed the case pending the Eleventh Circuit's ruling in Wooten. (Doc. 133).

Approximately 1½ years later, on May 11, 2010, the Court lifted the stay and entered an amended scheduling order setting this case for trial in Fall 2010. (Doc. 136). On June 11, 2010, Chase filed its (renewed) motion for summary judgment, disputing Plaintiffs' allegations and contending that a discount point is not a charge or fee for a settlement service under RESPA's Section 8(b), relying upon Judge Granade's ruling in Wooten. Chase asserts that if the Eleventh

---

[3] On appeal is Judge Granade's order of dismissal in that case, in which she dismissed both the RESPA claim and breach of contract claim after concluding that the interest rate charged in connection with a loan is *not* a settlement service under Section 8(b), but is a substantive term of a loan. Wooten, 2008 WL 687379 at *5. Specifically, Judge Granade – addressing the issue of whether an unsplit fee can be the subject of a Section 8(b) claim -- concluded that the fees were never split and that the loan was simply an overcharge. (Doc. 42 at 4-6). "As in the instant case, the plaintiffs in Gunter were charged a loan discount fee but allegedly received no interest rate reduction on their loans. The defendant in Gunter argued that there was no violation because there was no third party with whom the fee was shared or split. The court, relying primarily on Sosa, concluded that a single service provider that receives an undivided fee may violate RESPA. The court noted that the circumstances in Sosa were different, in that a third party received a portion of the fee in Sosa, but found Sosa's "general pronouncement that two service providers is not required to violate Section 8(b) was explicitly made." Gunter, *supra* at *11." (Doc. 42 at 4). Concerning the breach of contract claim, Judge Granade dismissed same because: "the plaintiffs' breach of contract claim alleges that '[t]he parties entered into a contract for a mortgage' and 'Defendant breached that contract by charging Plaintiffs a loan discount fee without actually providing a lower interest rate or other reasonable service in return.' … The complaint does not allege that defendant promised a reduced rate and, in fact, states that plaintiffs 'did not negotiate for a buy-down of the interest rate'….Plaintiffs cannot allege a breach where there was no promise to perform. There is no dispute that plaintiffs received their loans at the rates agreed to by the parties. Plaintiffs have not asserted a breach of any other term of their contracts. Thus, the court finds that plaintiffs have failed to adequately assert a breach of contract claim." (Id. at 10).

3

Circuit affirms Wooten – or if this Court arrives at the same conclusion – summary judgment is due to be granted. Chase contends further, citing Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1325 (11th Cir. 2008), that even if this Court finds contrary to Wooten, summary judgment should still be granted because RESPA requires that Plaintiffs prove "*no services at all* were provided in return for the" discount points and "Plaintiffs will never be able to prove that Chase rendered no services in exchange for the payment of discount points." (Doc. 150 at 1-2).

**B.      Findings of Fact**[4]

      **1.      Chase's Mortgage Loan Pricing**

In pricing loans, Chase applies a risk-based pricing method. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶4-5)).[5] Specifically, to price mortgage loans, Chase considers a number of risk factors (borrower's credit score/history, employment status, income, loan amount, loan-to-loan value ration and the property value at issue). (Id. (Decltn. Katz at ¶5-7)). Accordingly to Chase, depending on the particular risk factors for a particular borrower, the base rate would adjust to arrive at the loan terms offered to a qualified borrower – which would be some combination of interest rate, discount points and prepayment terms. (Id. (Decltn. Katz at ¶4-7)).

Chase also states that a borrower may pay discount points to change the prepayment conditions (to avoid prepayment penalty or limit the time during which such penalty may apply to the loan). (Id. (Decltn. Katz at ¶11)). For every discount point paid by a borrower, Chase alleges that it reduces the interest rate by .35%. (Id. (Decltn. Katz at ¶9)). If Chase were to

---

[4] When ruling on a motion for summary judgment, the court views "the evidence and all reasonable inferences in the light most favorable to the non moving party." Battle v. Board of Regents for Ga., 468 F.3d 755, 759 (11th Cir. 2006).

[5] A Senior Vice President at JPMorgan Chase Bank. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶1)).

calculate its base rates using only an interest rate -- with *no* associated discount points -- then Chase avers that the base interest rate would be higher. (Id. (Decltn. Katz at ¶16, 21); Doc. 141 at Ex. 14 (Dep. Katz at 180)).

### 2. **Plaintiffs' Mortgage Loans with Chase**

According to Chase, the base rates for Plaintiffs' loans were set forth in hard copy sheets as well as built into a computer pricing engine used to determine products for which borrowers might be eligible. (Doc. 141 at Ex. 14 (Dep. Katz at 180); Doc. 141 at Ex. 15 (Dep. Voellinger at 54-55)). Plaintiffs did not ask any questions about what the discount points were for, how the points were calculated, or what their loan terms would be absent payment of such points. (Doc. 141 at Ex. 16 (Dep. Gunter at 95-97); Ex. 17 (Dep. B.Redd at 76)).

#### a. **The Redds**

In late November 2006, after receiving a written offer for a 30-year fixed-rate mortgage (stating they were pre-qualified) from Chase through direct mail solicitation (as part of its Home Loan Direct program), the Redds contacted Chase about obtaining such a loan. (Doc. 141 at Ex. 12 at 98-99; Doc. 144-12 at Ex. 22-F (Dep. D.Redd at 33); Doc. 144-9 Ex. 22-C (Dep. Cush at 42-43)). Mr. Redd spoke with Chase loan specialist Thomas Cush. (Doc. 144-12 at Ex. 22-F (Dep. D.Redd at 38)).

According to Chase, the base rate for the Redds' loan was 9.525% with 2 discount points and a 5-year prepayment penalty. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶18)). Also according to Chase, based on risk factors unique to the Redds, their base rate was "increased" to 10.15%. (Id. (Decltn. Katz at ¶19)). To reduce this rate, Chase included an additional 1.5 discount points in the Redds' loan package. (Id. (Decltn. Katz at ¶20)). Chase's corporate representative Katz

5

testified that to eliminate entirely any prepayment penalty, Chase "added" 1 point – "[i]t is not a discount point" but "it's a prepay buyout." (Id.; Doc. 144-7 at Ex. 22-A (Dep. Katz at 219-220)). Accordingly, in addition to the 2 original discount points included in the base rate, Chase's loan package required the Redds to pay an additional 2.5 discount points to further buy down the interest rate and avoid any prepayment penalty. (Doc. 141 at Ex. 1(Decltn. Katz at ¶20)). This resulted in the Redds' monthly mortgage payment totaling $687.87. (Id. (Decltn. Katz at ¶17)); Doc. 141 at Exs. 9-11). According to Chase, if the Redds had not paid any discount points, the interest rate would have been 11.15% with a 5-year prepayment penalty. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶21)).

Subsequently, on December 20, 2006, the Redds entered into a 15 year fixed rate mortgage loan with Chase in the amount of $65,400.00 with a 9.625% interest rate and no prepayment penalty. (Doc. 107 at ¶8; Doc. 141 at Exs. 10, 11; Doc. 141 at Ex. 1 (Decltn. Katz at ¶17)). As noted in Line 802 of the HUD-1 Settlement Statement and the Good Faith Estimate, the Redds paid a loan discount fee equal to 4.5 points in the amount of $2,943.00. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶17, 20); Doc. 141 at Exs. 7, 8). In the loan disclosure statement provided by Chase and signed by the Redds on December 20, 2006, the statement sets forth an "estimated charge or range of charges" by Chase "for settlement services relating to home finance loans and lines of credit. . . [c]harges for the services stated below may not apply to every transaction[]" and specifically includes "*[c]harges for loan discount* and/or origination *fees* range from 0% to 6) of the loan amount." (Doc. 144-2 at Ex. 7 (emphasis added)).

b. <u>**Gunter**</u>

In early December 2006, Gunter contacted Chase about refinancing her existing mortgage loan on her home in Grand Bay, Alabama, after receiving a written offer for a 30-year fixed-rate mortgage (stating she was pre-qualified) from Chase through direct mail solicitation (as part of its Home Loan Direct program). (Doc. 141 at Ex. 12 at 98-99; Doc. 141 at Ex. 4; Doc. 144-11 at Ex. 22-E (Dep. Gunter at 38); Doc. 144-9 Ex. 22-C (Dep. Cush at 42-43)). Gunter spoke with Chase loan specialist Scott Stein, and applied for a loan and according to Chase, the base rate for the loan was 8.6% with 3.25 discount points and a 3-year prepayment penalty.[6] (Doc. 141 at Ex. 1 (Decltn. Katz at ¶14); Doc. 144-11 at Ex. 22-E (Dep. Gunter at 40); Doc. 144-7 at Ex. 22-A (Dep. Katz at 134, 175)). However, also according to Chase, Gunter's low credit score "increased" the base rate from 8.6 to 9.1% and to reduce this interest rate, Gunter was required to pay an additional 2.75 discount points. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶15); Doc. 144-7 at Ex. 22-A (Dep. Katz at 134, 175)). As such, the loan package prepared by Chase included Gunter paying 6 discount points. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶13, 16)). Under these loan terms, this resulted in a monthly mortgage payment for Gunter of $582.24. (Doc. 141 at Exs. 4, 6). Chase contends that if Gunter had not paid any discount points, the interest rate would have been 10.725% with a 3-year prepayment penalty. (Doc. 141 at Ex. 1 (Decltn. Katz at ¶16)).

On December 20, 2006, Gunter entered into a 3 year adjustable rate mortgage loan with Chase in the amount of $78,400.00 with an 8.138% interest rate and a 3-year prepayment

---

[6] As plaintiffs point out, Chase had already prequalified Gunter for a fixed rate loan, yet put her in an 3-year Adjustable Rate Mortgage loan (ARM). This ARM carried a 5 year prepayment penalty even though Chase's own corporate representative testified that a 3-year ARM cannot have a 5 year prepayment penalty --yet Gunter was charged .25 points to eliminate this prepayment penalty. (Doc. 144-7 at Ex. 22-A (Dep. Katz at 186-187)).

penalty, including a charge to Gunter for payment of 6 discount points. (Doc. 141 at Exs. 3, 5; Doc. 141 at Ex. 1 (Decltn. Katz at ¶13)). In the loan disclosure statement provided by Chase and signed by Gunter on December 20, 2006, the statement sets forth an "estimated charge or range of charges" by Chase "for settlement services relating to home finance loans and lines of credit. . . [c]harges for the services stated below may not apply to every transaction[]" and specifically includes "*[c]harges for loan discount* and/or origination *fees* range from 0% to 6) of the loan amount." (Doc. 144-2 at Ex. 7 (emphasis added)). However, prior to closing, Chase sent Gunter a Good Faith Estimate disclosing that payment of 6 discount points were part of her loan. (Doc. 141 at Ex. 2). At closing, and as noted in Line 802 of the HUD-1 Settlement Statement, Gunter was charged a loan discount fee equal to 6 points in the amount of $4,704.00. (Doc. 141 at Ex. 3).

3. **Loan Discount Points**

Line 802 on both the HUD-1 Settlement Statement and the Good Faith Estimate is the line designated by the Department of Housing and Urban Development ("HUD") for the listing and disclosure of discount points. (Doc. 144-1 at Ex. 1; Doc. 144-3 at Ex. 14;). Under the HUD Regulations, a Loan Discount is defined as follows:

> **802. Loan Discount:** Also called "points" or "discount points," a loan discount is a one time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you. Each "point" is equal to one percent of the mortgage account . . . .

(Doc. 144-5 at Ex. 17). HUD also lists a fee for a "loan discount" as a settlement service. (Id. "Your Settlement Costs").

Chase defines loan discount points as points that "would be paid up front by the borrower

8

to obtain a lower interest rate on the mortgage, to 'discount' the mortgage rate. Discount points, then, represented prepaid interest which reduces the interest rate. The more points paid, the lower the rate . . . ." (Doc. 144-1 at Ex. 4 at 9 (Chase's Internal Document - Prime Retail Sales Training)). Chase's website also provides that "paying discount points will lower your interest rate (as well as your monthly payment) . . . When you pay a discount point, you are essentially paying part of your interest to the lender up front. One discount point is typically equal to one percent of the loan amount, paid at closing . . . There is no requirement to pay discount points; whether or not you decide to pay points is completely up to you." (Id. at Ex. 5 at 11).

## II. DISCUSSION

### A. Relevant Law

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[7] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing

---

[7] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted: "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**B.     RESPA (Count I)**

Count I of the Amended Complaint alleges that Chase violated Section 2607(b) (also known as Section 8(b)) of RESPA because:

32. Plaintiffs received no service in exchange for the Loan Discount fee imposed by the Defendant on Plaintiffs' mortgages. Therefore, each point contained in the line 802 charge, constitutes a charge for which no service was provided in violation of section 8 of RESPA.

33. Defendant violated 12 U.S.C. 2607(b) and related federal regulations and interpretations by charging and receiving a fee other than for services actually rendered.

34. In connection with Plaintiffs' loans, Defendant did accept a portion, split or percentage of a charge imposed for services that were not bona fide, not rendered, not paid or for nominal, unreasonable or duplicative services for which no fees were earned and for which no fees should have been imposed, all in violation of RESPA at 12 U.S.C. § 2607, and RESPA's implementing regulations Regulation X, at 24 C.F.R. § 3500.14.

35. Defendant knowingly and intentionally imposed the fees complained of for the purpose of increasing its revenue.

(Doc. 107 at 10 at ¶¶ 32-35).

Section 8(b) of RESPA provides that: "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received *for the rendering of a real estate settlement service* in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b) Splitting Charges (emphasis added). RESPA defines settlement services as "any service provided in connection with a real estate settlement" including:

> . . . title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement[.]

12 U.S.C. § 2602(3).[8] See also Busby v. JRHBW Realty, Inc., 642 F. Supp. 2d 1283, 1290-1291 (N.D. Ala. 2009). The statute recites a non-exhaustive (but illustrative) list of examples,

---

[8] 24 C.F.R. 3500.2 lists the following as "settlement services" under RESPA: "(1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans); (2) Rendering of services by a mortgage broker (including counseling, taking of applications, obtaining verifications and appraisals, and other loan processing and origination services, and communicating with the borrower and lender); (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan; (4) Provision of title services, including title searches, title examinations, abstract preparation, insurability determinations, and the issuance of title commitments and title insurance policies; (5) Rendering of services by an attorney; (6) Preparation of documents, including notarization, delivery, and recordation; (7) Rendering of credit reports and appraisals; (8) Rendering of inspections, including inspections required by applicable law or any inspections required by the sales contract or mortgage documents prior to transfer of title; (9) Conducting of settlement by a settlement agent and any related services; (10) Provision of services involving mortgage insurance; (11) Provision of services involving hazard, flood, or other casualty insurance or homeowner's warranties; (12) Provision of services involving mortgage life, disability, or similar insurance designed to pay a mortgage loan upon disability or death of a borrower, but only if such insurance is required by the lender as a condition of the loan; (13) Provision of services involving real property taxes or any other assessments or charges on the real property; (14) Rendering of (Continued)

including title searches, document preparation, rendering of appraisals, and the origination of a loan (including loan processing, underwriting and funding of loans). Id. The common thread as to each of these types of services is that they relate to activities which are ancillary to "the closing of a real estate sale covered by RESPA." United States v. Graham Mortg. Corp., 740 F.2d 414, 418 (6th Cir. 1984). Thus, to be violative of the statute, there must be a "charge ... for the rendering of a real estate settlement service ... other than for services actually performed." In sum, the RESPA statute prohibits kickbacks, illegal mark-ups and unearned fees, as opposed to excessive and unreasonable fees. See Sosa v. Chase Manhattan Mortg. Corp., 348 F.3d 979, 981 (11th Cir. 2003);[9] Duggan v. Independent Mortg. Corp., 670 F. Supp. 652, 654 (E.D. Va. 1987) (noting that the purpose of Section 8(b) "is to prohibit kickback and referral fee arrangements, not to convert every violation of a loan agreement into a violation of [RESPA][]").

Chase contends that it is entitled to summary judgment because a discount point or fee is not a "charge" for a "real estate settlement services" and thus is not governed by Section 8(b).[10]

---

services by a real estate agent or real estate broker; and (15) Provision of any other services for which a settlement service provider requires a borrower or seller to pay. " Id.

[9] In Sosa v. Chase Manhattan Mortg. Corp., 348 F.3d 979, 981 (11th Cir. 2003), the Eleventh Circuit defined the various subparts of Section 8: "Section 8 of RESPA addresses kickbacks and unearned fees. Subsection 8(a) contains the general prohibition on making payments pursuant to any referral fee arrangement. Subsection 8(b) attempts to close any loopholes by prohibiting any person from giving or accepting any part of a fee unless services were actually performed. Read together, the two subsections create a broad prohibition against fees that serve solely to increase the cost of settlements to consumers." The Eleventh Circuit reasoned that "[t]o state a claim under the applicable part of subsection 8(b) of RESPA, the borrowers must allege that Chase 'accept[ed] any portion, split or percentage of any charge ... for the rendering of a real estate settlement service ... other than for services actually performed.' 12 U.S.C. § 2607(b)." Id. at 983.

[10] Since Sosa, the Eleventh Circuit clarified that Section 8(b) is not a price control provision to prohibit excessive fees, but a prohibition on charging fees "other than [for] services actually performed." (Continued)

Alternatively, Chase asserts that even if the Court concludes that discount points are "charges" for "settlement services" and thus governed by Section 8(b), the Eleventh Circuit case law requires that a plaintiff establish that "no services were rendered in exchange for a settlement fee" and Plaintiffs cannot establish such in this case.

The Court need not decide whether RESPA 8(b) applies to the fee charged in this case because even if RESPA 8(b) is applicable the plaintiffs claim would fail. Specifically, plaintiffs have failed to put forth sufficient evidence from which a reasonable jury could determine that the plaintiffs did not receive anything in return for the disputed fee.

The plaintiffs point to internal documents of Chase which purport to show that the discount point fee paid by the plaintiffs was actually for an origination fee and did not result in a lower interest rate for the plaintiffs. Specifically plaintiffs have submitted a document entitled "Accounting Data" which reflects that the $4704 fee and the $2943 fee were recorded in Chase's internal accounting system as "gross origination fees." (Doc. 144-2 at Exs. 8,9).[11] However, the

---

The central case for this holding is Friedman v. Market Street Mortg. Corp., 520 F.3d 1289, 1296-1298 (11th Cir. 2008), in which the Eleventh Circuit joined the Second, Third, Fourth, Seventh and Eighth Circuits in holding that Section 8(b) does not govern excessive fees because it is not a price control provision and Section 8(b) prohibits only the charging of fees "other than for services actually performed." Id. at 1296-1297.

[11] Plaintiffs have also submitted copies of computer screens which are labeled "Original GFE as disclosed on 12/4/2006" and show the figures of 4200.00 and 2943.00 labeled as "origination $ amount." (Doc. 144-6 at Ex. 19). However, the plaintiffs have also submitted copies of computer screens which show that these same figures, 4200.00 and 2943.00 were labeled respectively "Est. Pt(s) 6.000%" and "Est. Pt(s) 4.500%". (Doc. 144-6 at Ex. 21). The Court also notes that these figures correspond to the fees shown for loan discount fee on the plaintiffs' Good Faith Estimates. (Doc. 141 at Exs. 2,3). Thus, Exhibit 19, in context and without any further explanation, has minimal evidentiary value.

Plaintiffs have also submitted another Chase internal document labeled "Mortgage Funding Request" for each plaintiff which indicates that 6 points at $4704 and 4.5 points at $2943 were paid (Continued)

Court finds little support for plaintiffs' position based on an undefined internal categorization ("gross") of the fee. Plaintiffs have also submitted a recorded conversation between Chase representative Scott Stein, Gunter and at times Gunter's son Harand, in which Harand was told by Stein that a 6% origination fee would be charged. (Doc. 144-4 at Ex. 15 at 24). While this may be evidence to support a claim of misrepresentation, this evidence fails to sufficiently address Chase's evidence that the 6% fee charged as a loan discount <u>actually</u> resulted in a lower interest rate for the plaintiffs.

Plaintiffs have simply not put forth sufficient evidence to <u>rebut</u> Chase's evidence that the plaintiffs received a lower rate as a result of paying the fee. Instead, plaintiffs' evidence supports the argument that plaintiffs may not have received the full benefit of the fee charged, *i.e.*, the interest rate was not lowered commensurate with the number of discount points charged. Plaintiffs have supported this theory by pointing out the discrepancies in the calculations of the interest rates and the admissions by Chase that some of the points were charged for favorable prepayment terms as opposed to lowering the interest rate. Plaintiffs have also submitted an affidavit from its mortgage lending expert, Phillip G. Cantrell. Mr. Cantrell avers that after reviewing the documents it is his professional opinion that the plaintiffs did not receive "a discount for each of the points paid." (Doc. 144-5 at Ex. 16). However, failing to receive a discount for each of the points paid would be in the nature of an overcharge for the fee for discount points or an excessive fee for the discount received. An overcharge or an excessive fee

---

respectively. The document also indicates as follows: By Down: 0.000. While both parties have speculated as to the meaning of this entry, no evidence has been submitted which explains its significance. (Doc. 144-2 at Exs. 10, 11). Thus, the Court has not considered this evidence.

is not a RESPA 8(b) violation.  Accordingly, the motion for summary judgment is **GRANTED** on the RESPA 8(b) claim.

### C. Breach of Contract (Count II)

Count II of the Amended Complaint alleges, in pertinent part, as follows:

38. At a time prior to the closing of their respective loans, Plaintiffs and Defendant had entered into a contract for a mortgage loan.

39. The agreement included a promise by Defendant to loan Plaintiffs money in return for a mortgage on Plaintiffs' residences and their promise to repay the loan in monthly installments.

40. The contract did not include an agreement by Plaintiffs to pay a Loan Discount fee.

41. The contract fails for a want of consideration since Plaintiffs received no interest rate reduction in return for the payment of a Loan Discount fee.

42. There is a contract implied by law when Defendant charged a fee for a settlement service, but where no such service was provided.

43. Defendant breached the contract by charging Plaintiffs an unearned Loan Discount Fee.

44. Defendant breached the contract by failing to give Plaintiffs an interest rate reduction in return for each Loan Discount point charged and collected.

(Doc. 107 at 11 at ¶¶ 38-44).

Chase moves for summary judgment as to the breach of contract claim on the grounds, in sum, that the Plaintiffs received exactly what they paid for -- a loan discount (that Chase "reduced Plaintiffs' interest rates and/or made favorable changes to the prepayment conditions on their loans in exchange for the payment of discount points[]").  Additionally, Chase contends that Plaintiffs have failed to show that it did not perform under the contracts.

Plaintiffs cannot proceed under the dual theories of 1) a breach or an oral or a written

15

contract and 2) breach of an implied contract. See, e.g., White v. Microsoft Corp., 454 F. Supp. 2d 1118, 1133 (S.D.Ala. 2006) (stating that "[i]f the parties' dealings are covered by an express agreement, then there is no need to imply an agreement between them to ward off inequitable results. Based on that principle, where a plaintiff has brought claims sounding in both express contract and quasi-contract as to the same subject matter, Alabama courts have deemed the quasi-contract claim not to be cognizable[]"). See also Kennedy v. Polar-BEK & Baker Wildwood Partnership, 682 So.2d 443, 447 (Ala.1996) (noting that "under Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible . . . where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter[]"). At oral argument, plaintiffs were asked to clarify their claim; the plaintiffs indicated that they were proceeding under a breach of implied contract theory.

"There are two kinds of implied contracts-those implied in fact and those implied in law. Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment, etc." Mantiply v. Mantiply, 951 So.2d 638, 656 (Ala. 2006). "Unjust enrichment/quasi-contract is a type of implied contract under Alabama law." White v. Microsoft Corp., 454 F. Supp. 2d 1118, 1132 at note 23 (S.D. Ala. 2006). As detailed in White: "under Alabama law, it is clear that an unjust enrichment claim sounds in the nature of quasi-contract, as the law equitably implies a contract between the parties to prevent the unjust enrichment of a defendant at the expense of a plaintiff." Id. at 1132. The Court concluded that "[a] claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts

to imply a 'contract' as a matter of law .... [t]he law will, in essence, 'create' an agreement in situations where it is deemed unjust for one party to have received a benefit without having to pay compensation for it. It derives, not from a 'real' contract but a 'quasi-contract.'" Id. at 1133. Additionally, as recently articulated in Wyeth, Inc. v. Blue Cross and Blue Shield of Alabama, 2010 WL 152123, *9 (Ala. 2010):

> Alabama courts require unconscionable conduct on the part of the defendant in order to make a claim for unjust enrichment. The Alabama Supreme Court concluded that the retention of a benefit is unjust if '(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched.' Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala.2006) (quoting Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala.2004)) (emphasis in original)).

In this case, the plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to their breach of implied contract claim.[12] Specifically, there is a factual dispute as to whether plaintiffs received the full benefit of that for which they paid; and also, whether this was due to fraud or misrepresentation by Chase or a mistake of fact by plaintiffs.

Further, the plaintiffs have asserted class allegations as to the claim for implied contract. However, pursuant to Wyeth and the cases cited therein, it appears that unjust enrichment claims generally are not appropriate for class certification. "Because unjust-enrichment claims are fact specific to each case, this Court has repeatedly held that such claims are unsuitable for class-action treatment." Wyeth, 2010 WL 152123, *6 (quoting Avis Rent A Car Sys., Inc. v. Heilman,

---

[12] This assumes that an implied contract theory could apply to the facts of this case. This is an issue that was not adequately briefed by either party.

17

876 So.2d 1111, 1123 (Ala. 2003)).  Accordingly, the plaintiffs are **ORDERED** to file a brief addressing this issue on or before **August 23, 2010;** any Response by the Defendant is due on or before **September 7, 2010.**

Thus, it is **ORDERED** that <u>the Pre-Trial Conference scheduled for Thursday, August 12, 2010 and the Trial Setting for September 2010 are CONTINUED until this foregoing issue is resolved</u>.

**DONE** and **ORDERED** this the **9th** day of **August 2010.**

/s/ Kristi K. DuBose  
**KRISTI K. DuBOSE**  
**UNITED STATES DISTRICT JUDGE**